

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-14-1995

# Zolfo, Cooper & Co v Sunbeam

Precedential or Non-Precedential:

Docket 94-3271

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"Zolfo, Cooper & Co v Sunbeam" (1995). *1995 Decisions.* Paper 75.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/75

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

ZOLFO, COOPER & CO.,
                    Appellant

v.

SUNBEAM-OSTER COMPANY, INC.

———————————————————————————————————

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civil Action No. 91-cv-01665)

—————————————————

Argued November 1, 1994

Before:  SCIRICA, LEWIS and RONEY*, <u>Circuit</u> <u>Judges</u>

(Filed March 14, 1995)

JOY F. CONTI, ESQUIRE (ARGUED)
DAVID F. McGONIGLE, ESQUIRE
Kirkpatrick & Lockhart
1500 Oliver Building
Pittsburgh, Pennsylvania 15222

    Attorneys for Appellant


DENNIS J. LEWIS, ESQUIRE (ARGUED)
LAURA A. MEADEN, ESQUIRE
Cohen & Grigsby
625 Liberty Avenue
2900 CNG Tower
Pittsburgh, Pennsylvania 15222-3115

    Attorneys for Appellee

*The Honorable Paul H. Roney, United States Circuit Judge for the Eleventh Judicial Circuit, sitting by designation.

―――――――――――――――――

OPINION OF THE COURT

―――――――――――――――――

SCIRICA, Circuit Judge.

This is an appeal from the bankruptcy court's award, pursuant to 11 U.S.C. § 330 (1988),[1] of over $3.1 million in fees and expenses for accounting services Zolfo, Cooper & Company provided during Chapter 11 reorganization proceedings to the debtors, Allegheny International, Incorporated, its affiliates, and subsidiaries. The debtors were predecessors in interest to appellee, Sunbeam-Oster Company. Zolfo Cooper disputes the bankruptcy court's disallowance of fees totalling $249,957.87 and of expenses totalling $84,852.97. The district court affirmed the bankruptcy court, and this appeal followed. We will affirm.

I.

On February 20, 1988, the debtors filed petitions for bankruptcy under Chapter 11 of the Bankruptcy Code. On July 12, 1990, the bankruptcy court confirmed the debtors' disclosure statement and plan for reorganization, and in September 1990 the plan was consummated. As a result, Sunbeam-Oster Company acquired all the assets and liabilities of the debtors.

At the outset of the bankruptcy process the debtors filed motions for authorization to employ financial and

―――――――――――――――――――――――――

[1]. In 1994, Congress made revisions to § 330(a) which apply to cases commenced after October 22, 1994. See Bankruptcy Reform Act of 1994, Pub. L. No. 103-394, §§ 224, 702, 108 Stat. 4106, 4130, 4150 (1994).

bankruptcy advisors. The bankruptcy court authorized Zolfo Cooper's employment on February 20, 1988. Zolfo Cooper was one of seventeen legal, financial, and accounting firms, each of which submitted monthly fee applications to the bankruptcy court for review and approval during the bankruptcy proceedings.

On December 14, 1989, the bankruptcy court issued the first of many opinions regarding fee applications, in this case a decision on the fee requests of four law firms. In its opinion, the bankruptcy court stated, "With certain exceptions, we find the hourly rates requested to be too high. They depart from the cost of comparable services in Western Pennsylvania." In re Allegheny Int'l, Inc., No. 88-448, slip op. at 4 (Bankr. W.D. Pa. Dec. 14, 1989) ("December 14, 1989, Opinion"). The court noted its dismay over the behavior of the lawyers who "reinvented the wheel several times" and were parties to "greed and personality clashes . . . ." Id. at 5.

The court turned to consider the "hourly rates in our local bankruptcy court marketplace." Id. (quoting In re Shaffer-Gordon Assocs., Inc., 68 B.R. 344, 350 (Bankr. E.D. Pa. 1986)). It determined "our experience tells us that the market rate in Western Pennsylvania for bankruptcy counsel of high caliber is $150 per hour. We routinely observe quality bankruptcy work billed at that rate in chapter 11 cases by partners, and lesser amounts by associates." Id. at 5-6.

The bankruptcy court then stated it recognized the difficulty, complexity, and size of this particular case, and announced it would therefore "allow rates higher than the

aforementioned market rates, as listed below in our discussion of the appropriate rates for each of the four law firms." Id. at 6. The court added the caveat that the maximum rate was not unvaryingly warranted as the case also contained many routine matters. It explained lower rates were proper due to lack of success and because payment was guaranteed. It reasoned that bankruptcy practice is national in scope for large cases such as this one, but that the New York City rates the law firms requested would not alone set the national standard.

In orders and memorandum opinions dated August 21, 1990, and December 20, 1990, the bankruptcy court addressed Zolfo Cooper's applications for interim compensation for the periods February 20, 1988, to February 28, 1989, and March 1, 1989, to September 15, 1990, respectively. On April 30, 1991, the bankruptcy court issued an order regarding Zolfo Cooper's application for compensation for services from September 16, 1990, to December 31, 1990, for all previously disallowed fees and expenses, and for premium compensation in the amount of $1.1 million. The bankruptcy court denied this last application in its entirety.

In the bankruptcy court's memorandum opinion of August 21, 1990, it incorporated by reference the December 14, 1989, opinion described above. The court explained it was capping Zolfo Cooper's fees at an hourly rate of $225 per hour in part because "almost all of the work done by this applicant was done by highly paid personnel; there were virtually no lower paid personnel rendering services. Moreover, the court is concerned

that the services rendered by this applicant may overlap the services of the debtor's counsel, investment bankers, and accountants. For these reasons, the court limits hourly rates to $225." In re Allegheny Int'l, Inc., No. 88-448, slip op. at 2 (Bankr. W.D. Pa. Aug. 21, 1990) ("August 21, 1990, Opinion"). The court also criticized Zolfo Cooper's fee petitions, which it asserted "contain numerous listings which are too vague or do not specify the parties involved or the subject matter of the service . . . . For those listings, the court is unable to determine whether such services were actual and necessary services and whether the time allotted was reasonable." Id. at 4.

Zolfo Cooper filed a motion for reconsideration and a request for clarification. The bankruptcy court denied the motion for reconsideration on August 16, 1991, and expressly reaffirmed its earlier orders and opinions. The August 16, 1991, order also incorporated by reference a separate memorandum opinion of the same date which stated, "The rates [we] found to be the costs of comparable services in non bankruptcy situations in Western Pennsylvania may not be the rates which are prevalent in other metropolitan areas or which may have become comparable nationally in large Chapter 11 cases." In re Allegheny Int'l, Inc., No. 88-448, slip op. at 5 (Bankr. W.D. Pa. Aug. 16, 1991) ("August 16, 1991, Opinion"). The bankruptcy court then stated that Japonica Partners, who ultimately took control of the debtors through Sunbeam-Oster,[2] had voluntarily paid higher rates

---

[2]. Japonica Partners held 99.6% of the stock of Sunbeam-Oster.

to the professionals it hired.  The other professionals urged these rates upon the bankruptcy court as evidence of comparable market rates for their services.  The bankruptcy court noted, however, that Japonica Partners paid those rates during a hostile takeover, and that there were "important differences between the two processes and that the professional fees obtained in mergers and acquisition and hostile takeover activities are not comparable for Chapter 11 cases."  Id. at 6.[3]

Zolfo Cooper appealed the bankruptcy court's order of August 16, 1991, to the district court, which affirmed.  This appeal followed.

II.

In our review of the bankruptcy court's factual findings we, like the district court, review for clear error. Resyn Corp. v. United States, 851 F.2d 660, 664 (3d Cir. 1988). Our review of legal precepts is plenary.  Id. (quoting Universal Minerals, Inc. v. C.A. Hughes & Co., 669 F.2d 98, 102 (3d Cir. 1981)).  Since we are in as good a position to review the bankruptcy court's decision as the district court was, we will review the bankruptcy court's findings by the standards the district court would apply.  Universal Minerals, 669 F.2d at 102. Fee awards are reviewed for an abuse of discretion, which can occur "if the judge fails to apply the proper legal standard or to follow proper procedures in making the determination, or bases

---

[3].  The bankruptcy court's final order pertaining to Zolfo Cooper was a clarifying order dated September 5, 1991, which expressly reaffirmed its earlier orders.

an award upon findings of fact that are clearly erroneous." Electro-Wire Prods., Inc. v. Sirote & Permutt, P.C. (In re Prince), 40 F.3d 356, 359 (11th Cir. 1994) (quoting Hatcher v. Miller (In re Red Carpet Corp.), 902 F.2d 883, 890 (11th Cir. 1990)).

Jurisdiction in the bankruptcy court was proper under 28 U.S.C. § 157(a) (1988). The district court had jurisdiction over the appeal from the final order of the bankruptcy court, id. § 158(a), and we have jurisdiction over the appeal of the district court's judgment under 28 U.S.C. § 158(d).

III.

A.

Zolfo Cooper contends the bankruptcy court erred in setting a cap on the rates charged by four law firms in its December 14, 1989, Opinion. The bankruptcy court incorporated the December 14, 1989, Opinion in its August 21, 1990, Opinion, in setting a maximum rate on Zolfo Cooper's hourly fees. Zolfo Cooper contends the bankruptcy court improperly ignored evidence of the hourly rate which Zolfo Cooper commands in the national market for its services. Instead, Zolfo Cooper asserts, the bankruptcy court looked to the local market for professional services and applied its own notion of the proper hourly rate.

Zolfo Cooper asserts the bankruptcy court's fee decisions misapply the law, pointing out that the bankruptcy court acknowledged the Allegheny International bankruptcy was "national in scope." December 14, 1989, Opinion at 11. Zolfo Cooper argues this warranted compensation at higher rates than

allowed, because "[professionals'] hourly rates are fixed by the market in which they customarily practice, not by the Court. . . .  In [unusually large cases], the Court is free to look to a national market in making fee allowances."  In re Jensen-Farley Pictures, Inc., 47 B.R. 557, 579 (Bankr. D. Utah 1985).

The question of what fees should be awarded to professionals hired to assist with a bankruptcy or management of a bankrupt estate is governed by 11 U.S.C. § 330, which provides in part:

> **(a)** After notice to any parties in interest and to the United States trustee and a hearing, and subject to sections 326, 328, and 329 of this title, the court may award to a trustee, to an examiner, to a professional person employed under section 327 or 1103 of this title, or to the debtor's attorney--
>
> **(1)** reasonable compensation for actual, necessary services rendered by such trustee, examiner, professional person, or attorney, as the case may be, and by any paraprofessional persons employed by such trustee, professional person, or attorney, as the case may be, based on the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title; and
>
> **(2)** reimbursement for actual, necessary expenses.

Recently we issued a comprehensive opinion interpreting this section.  In re Busy Beaver Bldg. Ctrs., 19 F.3d 833 (3d

Cir. 1994). In Busy Beaver, we addressed whether certain paralegal expenses were compensable under § 330. We held § 330's language, "the court may award" reasonable compensation, "imbues the court with discretionary authority," and that the bankruptcy court possesses both the power and the duty to review fee applications. Id. at 841.

We recognized in Busy Beaver that § 330 presents a "market-driven approach," id. at 852, in which the cost of comparable services is the most important of the listed factors, the others being the nature, extent, and value of the services, id. at 849. We stated, "We disapprove of any approach that allows a court confronted with undisputed, credible, contrary evidence of market practices in the record to rely solely on its own judgment . . . ." Id. at 848.

On the other hand, we also noted that reliance on the market is tempered because "the court will, in practical terms, act as a surrogate for the estate, reviewing the fee application much as a sophisticated non-bankruptcy client would review a [professional] bill." Id. And we observed that "certainly a bankruptcy judge's experience with fee petitions and his or her expert judgment pertaining to appropriate billing practices, founded on an understanding of the legal profession, will be the starting point for any analysis." Id. at 854.

In announcing the market-driven approach, Busy Beaver cited favorably to In re Patronek, 121 B.R. 728 (Bankr. E.D. Pa. 1990), which had relied on market information to set fees for purposes of § 330. Busy Beaver, 19 F.3d at 854 n.31. In In re

Patronek, the court stated, "The proper measure of what fee is reasonable in any context is ascertainment of what an informed client and an informed attorney would agree should be paid for certain services. If the marketplace naturally establishes a price for a service, then we believe that it is logical to assume that this is [the proper figure]." 121 B.R. at 731.

But in Busy Beaver we also added that where evidence proves a market rate that directly contradicts the court's judgment, the market rate must take precedence. 19 F.3d at 854. Significantly, however, we held the bankruptcy court may discount evidence presented by the fee applicant, since courts "are themselves experts on the value of services rendered in a bankruptcy proceeding and are not bound by the evidence offered." Id. (quoting York Int'l Bldg., Inc. v. Chaney (In re York Int'l Bldg., Inc.), 527 F.2d 1061, 1068 (9th Cir. 1975)). We also stated, "[T]he court should to the extent practicable make findings of fact and provide reasoned explanations in the record to facilitate review." Id. at 854.

Busy Beaver was decided after the bankruptcy proceedings were completed in this case, and therefore the bankruptcy court did not have the benefit of its guidance. Yet Busy Beaver is controlling even though it was decided after the bankruptcy court's opinions. See Gulf Offshore Co. v. Mobil Oil Corp., 453 U.S. 473, 486 n.16 (1981) (stating "[a]n appellate court must apply the law in effect at the time it renders its decision" (citation omitted)); Ziffrin, Inc. v. United States, 318 U.S. 73, 78 (1943) (noting "[a] change in the law between a

nisi prius and an appellate decision requires the appellate court to apply the changed law"); Hill v. Equitable Trust Co., 851 F.2d 691, 695 (3d Cir. 1988) (observing "a controversy is to be decided on the law as it exists at the time the appellate court considers the case, although that law may differ from the one in force at the time the trial court decided the matter"), cert. denied, 488 U.S. 1008 (1989).

In its December 14, 1989, Opinion, the bankruptcy court looked to In re Fine Paper Antitrust Litigation, 751 F.2d 562 (3d Cir. 1984), in which we had explained that "[t]he value of an attorney's time generally is reflected in his normal billing rate." Id. at 583 (quoting Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp., 487 F.2d 161, 167 (3d Cir. 1973)). The bankruptcy court followed this standard. At the final hearing on fee applications, the bankruptcy court noted its strong reliance on the market for professional services in setting the fee allowances: "[W]e used . . . as best we could the actual fees being paid by the debtor for the previous two years with some minor modifications as to what they were paying the lawyers over that time period or something close to that, so as to somehow attempt to get a good picture of what the market was for a company of this size and for a company with these kinds of problems." J. App. at 1019.

Zolfo Cooper argues that "in large bankruptcy cases, like Allegheny International, professionals with national practices should receive compensation at their normal hourly rates, even if that rate is much greater than the local rate."

Appellant's Br. at 30-31.  Zolfo Cooper claims it therefore should have gotten the rates it requested.

While in Busy Beaver we cited approvingly to cases in which out-of-state firms appropriately received higher rates in difficult cases, we also observed that "the reasonable hourly rate has a cap based on the expected and actual complexity of the case, a cap which, while flexible, should stave off clear abuses [by fee applicants]."  19 F.3d at 856 n.35.  We noted that the court should review a fee application to "ensure the applicant exercises the same 'billing judgment' as do non-bankruptcy [professionals] . . . ."  Id. at 856.[4]

The bankruptcy court looked to the evidence of market rates before it and adjusted the rates according to its experience and the nature, extent, and value of the services.  The court explained what the local bankruptcy rates were and why the professionals (including Zolfo Cooper) deserved higher rates

---

[4].  The Court of Appeals for the Seventh Circuit made this point in Gusman v. Unisys Corp., 986 F.2d 1146, 1150-51 (7th Cir. 1993).  Observing that the lawyer's hourly rate is a starting point provided by the market for analysis of a reasonable fee, the court stated:

> A judge who departs from this presumptive rate must have some reason other than the ability to identify a different average rate in the community.  A judge might say, for example, that the lawyers did not display the excellence, or achieve the time savings, implied by their higher rates.  A judge might conclude that the plaintiff did not need top-flight counsel in a no-brainer case.

Id. at 1151.

than those local rates.  It also explained why the applicants did not deserve New York rates and why it was exercising its discretion to reduce the request.[5]

The baseline rule is for firms to receive their customary rates.  Zolfo Cooper cites to three record items which it claims established the rates it customarily charges: (1) its affidavit supplied as part of the debtors' motion to retain Zolfo Cooper and other professionals; (2) a retention letter from Zolfo Cooper to Allegheny International for services to be performed before the bankruptcy filing; and (3) evidence of rates paid by Sunbeam-Oster to professionals retained by it and Japonica Partners (which controls Sunbeam-Oster).  J. App. at 14, 32-35, 692-735.

---

[5]. We explicitly countenanced this approach in Busy Beaver, 19 F.3d at 856 n.35.  In Busy Beaver we cited favorably to In re Waldoff's, Inc., 132 B.R. 329, 335-36 (Bankr. S.D. Miss. 1991), and In re Casull, 139 B.R. 525, 528 (Bankr. D. Colo. 1992).  In each of those cases, the bankruptcy court refused to award the professional its higher out-of-town rates on the basis that the professional had failed to show those rates were justified. While in this opinion we focus upon the bankruptcy court's decisions, we note the proof submitted by Zolfo Cooper was not particularly strong.

In another appeal treating the fee decisions by the bankruptcy court in this case, Fulbright & Jaworski v. Sunbeam-Oster Co. (In re Allegheny Int'l, Inc.), 139 B.R. 336, 341 (W.D. Pa. 1992), the district court assessed how the bankruptcy court reached its conclusions, and found "that the bankruptcy court properly considered the fact that New York market rates are higher than those of western Pennsylvania, and adjusted [Fulbright & Jaworski's] fee award according to other significant factors."  Cf. In re Allegheny Int'l (Wells Fargo), 131 B.R. 24, 31 (W.D. Pa. 1991) (finding the bankruptcy court's reduction of fees to New York law firm Paul Weiss erroneous because the sole basis for reduction was that Paul Weiss should be subject to the cap the court set in its December 14, 1989, opinion).

Given this evidence of what Zolfo Cooper typically charges, a reduction of those rates, without more, might have been error given our admonition in Busy Beaver that "[w]e disapprove of any approach that allows a court confronted with undisputed, credible, contrary evidence of market practices in the record to rely solely on its own judgment . . . ." 19 F.3d at 848. But the bankruptcy court did not rely solely on its own judgment when it considered, and then reduced, Zolfo Cooper's rates, nor did Zolfo Cooper present much evidence of the fees it customarily charges.

Zolfo Cooper's evidence provides only a range of fees. The bankruptcy court found Zolfo Cooper was billing excessively in the high end of that range and capped the fees accordingly. See Ursic v. Bethlehem Mines, 719 F.2d 670, 677 (3d Cir. 1983) (observing that "[r]outine tasks, if performed by senior partners in large firms, should not be billed at their usual rates. A Michelangelo should not charge Sistine Chapel rates for painting a farmer's barn"). The court explained why it was capping the rates for Zolfo Cooper below the New York rates it requested, observing Zolfo Cooper had duplicated effort, used too many high-level personnel, and submitted an incomplete fee application.[6]

---

[6]. While the bankruptcy court's opinions did not mention it as a basis for decision, we find it instructive to note that several of Zolfo Cooper's employees raised their hourly rates substantially during the course of the bankruptcy proceeding. The increases ranged from 20% to 76%. Mr. LoBiondo charged the largest number of hours for Zolfo Cooper, and his rate increase was the sharpest, rising 76% over two years from $170 to $300. While the record does not provide information to enable us to compare these increases with the increases of other professionals, we do note that the associate at Fried, Frank,

The court held there was a blend of complicated and simple matters relating to this particular proceeding, and that although the case was national in scope, there was no particular reason to assume the cost of comparable services should be the rates in New York City. Zolfo Cooper bore the burden of proof to demonstrate its customary fees were warranted and did not carry it. In re Metro Transp. Co., 107 B.R. 50, 53 (E.D. Pa. 1989).

We believe the bankruptcy court erred in taking the market rate for services in Western Pennsylvania as a starting point. This is not the appropriate starting point for the determination of the market in which Zolfo Cooper practices. The idea that a firm should be restricted to the hourly rate typical in the locale of the case "is unduly parochial particularly in this age of national and regional law firms working on larger more complex bankruptcy cases of more than local import." In re Robertson Cos., 123 B.R. 616, 619 (Bankr. D.N.D. 1990). The bankruptcy court here should have looked first to Zolfo Cooper's customary market (New York) and then made reductions based on the other factors.[7] But this error does not require reversal because the bankruptcy court achieved substantially the same result.

(..continued)
Harris, Shriver & Jacobson who billed the majority of the firm's hours increased her rate from $160 to $180 per hour over the same period.

[7]. The rates Zolfo Cooper requested ranged from $125 to $325 for its professional staff (before it raised those rates, see supra note 6). The New York law firms requested rates ranging from $70 to $335. The bankruptcy court observed that appropriate rates in Western Pennsylvania were $150, but ultimately set the top billing rate at $225.

While the bankruptcy court erroneously started with Western Pennsylvania as the baseline, it properly raised the hourly rates as close to the New York rates as it determined was warranted given its findings regarding Zolfo Cooper's improper billing.[8] On the facts of this case there is no substantive difference between the two approaches (i.e., the correct method of starting with New York rates and lowering them and the incorrect method of starting with local rates and raising them). Thus, any potential error by the bankruptcy court did not affect Zolfo Cooper's right to compensation. When substantial rights are not affected by an error, reversal is not appropriate. McQueeney v. Wilmington Trust Co., 779 F.2d 916, 923-28 (3d Cir. 1985).

The bankruptcy court cut Zolfo Cooper's total compensation request approximately twelve percent. When faced with a reduction of ten percent in a similar case, we stated that "[n]o court, viewing a record of this magnitude from the distance inherent in appellate review, could assess the reasonability of a reduction as slight as ten percent with flawless precision."

---

[8]. The bankruptcy court stated, "[I]t is for the Court to determine what a reasonable hourly rate for a certain task is, when such a determination is based on our constant exposure to the rates requested by other members of the local bankruptcy bar." December 14, 1989, Opinion at 6 (citations and quotations omitted). This language alone might suggest the bankruptcy court did not put sufficient emphasis on the market information that was available to it. But the remainder of the bankruptcy court's opinions and other language in the opinion just quoted show that in fact the court was paying a great deal of attention to evidence of market rates. We are satisfied the language quoted here was aberrational.

<u>Daggett v. Kimmelman</u>, 811 F.2d 793, 798 (3d Cir. 1987).  We

conclude the reduction here was not an abuse of discretion.

B.

The bankruptcy court did not specifically rule on Zolfo

Cooper's fee applications until its August 21, 1990, Opinion.

This, Zolfo Cooper argues, created reversible error by ignoring

the command in <u>Busy Beaver</u> that the decision whether to retain

"nationally renowned [professional firms]," with their "lofty

fees," should be made "as early as practical, preferably before

the debtor retains the professional."  19 F.3d at 856 n.35.

Zolfo Cooper had worked since February 1988, and contends it was

unfairly prejudiced by the delay.  Zolfo Cooper also asserts 11

U.S.C. § 328(a) (1988)[9] applies and that the court could not

change the terms of employment set forth in Zolfo Cooper's motion

for retention without a finding under § 328(a) that the terms of

Zolfo Cooper's retention had proved improvident.

---

[9].  Section 328(a) provides in part:

> The trustee . . . with the court's
> approval, may employ or authorize the
> employment of a professional person . . . on
> any reasonable terms and conditions of
> employment . . . .  Notwithstanding such
> terms and conditions, the court may allow
> compensation different from the compensation
> provided under such terms and conditions
> after the conclusion of such employment, if
> such terms and conditions prove to have been
> improvident in light of developments not
> capable of being anticipated at the time of
> the fixing of such terms and conditions.

Bankruptcy courts should, as we noted in <u>Busy Beaver</u>, make a determination as early as possible regarding acceptable rates and the possible ceilings they will set on the professional's fees.  The failure to do so is not, however, reversible error in this case.  Zolfo Cooper's claim to money from the bankruptcy estate is limited to a claim for reasonable fees.  11 U.S.C § 330(a)(1).  The fee applicant has the burden of proving it has earned the fees it requests, and that the fees are reasonable.  <u>In re Metro Transp.</u>, 107 B.R. at 53.  Accordingly, Zolfo Cooper cannot claim reliance on a particular amount of compensation, and the mere fact of delay in assessing Zolfo Cooper's fee request was not an error.

It is a separate question whether the bankruptcy court could, consistent with § 328(a), reach an independent determination of the fees to which Zolfo Cooper was entitled without a finding that the rates set out in Zolfo Cooper's retention affidavit were improvident.  In <u>In re C & P Auto Transport, Inc.</u>, 94 B.R. 682, 685 n.4 (Bankr. E.D. Cal. 1988), the court observed the importance of the precise language of the order authorizing the professional's employment:

> If the order does not expressly and unambiguously state specific terms and conditions (<u>e.g.</u> specific hourly rates or contingency fee arrangements) that are being approved pursuant to the first sentence of section 328(a), then the terms and conditions are merely those that apply in the absence of specific agreement.  That leaves the court free to apply lodestar rates unfettered by the strictures of the second sentence of section 328(a) . . . .

We agree with this observation as it establishes a useful and appropriate presumption that prevents courts from being bound to specific terms unintentionally. There is no reason why the burden should be on the court to specify in its order authorizing retention of the professional that it rejects specific terms and conditions. Instead, the burden should rest on the applicant to ensure that the court notes explicitly the terms and conditions if the applicant expects them to be established at that early point. Further, the bankruptcy court's duty to conduct an independent examination of fee applications for services rendered, Busy Beaver, 19 F.3d at 841, would be unduly restricted if employment authorization orders were routinely construed as binding the court to particular terms of employment.

In the present case, the bankruptcy court order authorizing Zolfo Cooper's retention stated that "debtors in possession[] be and hereby are authorized to retain the firm of [Zolfo, Cooper & Co.] to perform the services as set forth in the foregoing Motion and Affidavit of Frank John Zolfo." In re Allegheny Int'l, Inc., No. 88-448 (Bankr. W.D. Pa. Feb. 20, 1988) (order authorizing retention of Zolfo Cooper). This language only established the nature and range of services. It cannot bind the court to particular terms and conditions of compensation.

## C.

Finally, Zolfo Cooper argues the bankruptcy court erred by not properly taking into account its supplemental applications for expenses, which it contends corrected any deficiencies in its

prior applications for reimbursement.  Zolfo Cooper incurred these expenses before December 1, 1989.

When a bankruptcy court refused to reimburse Zolfo Cooper for these expenses, explaining in its opinion of August 21, 1990, that they were insufficiently documented.  Zolfo Cooper contends it supplemented the documentation three times and requested the court review the supplemental documentation.  Zolfo Cooper argues the bankruptcy court improperly failed to acknowledge or comment upon the supplemental documentation.

When a bankruptcy court denies compensation to an applicant who has attempted to comply in good faith with specificity requirements of the bankruptcy rules, the court should allow time to supplement the application.  The court also "should notify the applicant of its particular reasons for denying the fees, and . . . allow the professional the occasion to defend his or her fee application with legal arguments and/or evidence (of market practices, etc.) at a hearing."  Busy Beaver, 19 F.3d at 847.

In In re Four Star Terminals, Inc., 42 B.R. 419, 437-38 (Bankr. D. Alaska 1984), the court denied expense requests that were improperly documented but stated the applicant could resubmit these expenses with proper documentation in a later application.  Our statements in Busy Beaver support this approach.  Absent a lack of good faith on the part of the applicant, a court should allow the applicant a chance to cure defects in its original expense documentation.  See Busy Beaver, 19 F.3d at 846-47.

The bankruptcy court found Zolfo Cooper's initial application for expenses grossly inadequate, stating, "None of the expenses listed in the petitions are properly documented. The applicant has failed to submit itemized expenses. . . . The applicant's attempt to bill the estate for large sums, without providing adequate details, is incredible."[10]  August 21, 1990, Opinion at 6.  The court nevertheless allowed significant portions of the expenses requested, including reimbursement for travel, photocopying, postage, and telecopying.

---

[10].  Zolfo Cooper complains this decision of the bankruptcy court was prompted by its December 14, 1989, Opinion in which it announced its intention to follow Bankruptcy Rule 2016(a) and Local Bankruptcy Rule 9016.1.  Zolfo Cooper suggests it was unfairly expected to comply with the December 14, 1989, order for expenses it had already incurred.  This argument fails for two reasons.  First, Rule 9016.1 of the Local Rules of the United States Bankruptcy Court for the Western District of Pennsylvania (1989) provides in part:

> Unless otherwise ordered, no compensation or expenses will be allowed to any professional for any service rendered in any case unless an application for fees and expenses is filed which provides the following.
>
> . . . .
>
> 6.   An itemization of the expenses for which reimbursement is requested.

The bankruptcy court's December 14, 1989, Opinion was thus not necessary to put Zolfo Cooper on notice of what was required. Second, Zolfo Cooper had eight months after December 14, 1989, before the bankruptcy court ruled on its first fee applications. This period was clearly sufficient for Zolfo Cooper to supplement its application before the bankruptcy court ruled on its application.

The bankruptcy court denied expenses for meals, support staff, and direct expenses, holding they were improperly documented and that meals (to the extent they were local meals) and support staff expenses were overhead[11] and not subject to reimbursement. With respect to the direct expenses, the court stated it could not determine what they were, and therefore could not allow them.

The bankruptcy court continued in subsequent rulings to disallow these expenses without comment, prompting a letter from Zolfo Cooper's counsel dated August 30, 1991, which noted Zolfo Cooper had made "considerable efforts to clarify the documentation of its expenses," and requested the court clarify that it had examined the supporting documentation. J. App. at 916. Zolfo Cooper stated it was raising the issue "of the Unpaid Expenses not to cause the Court to revisit a matter that has already been decided, but merely to confirm that it indeed has been decided . . . ." Id.

The bankruptcy court responded "[t]he portion of the August 21, 1990 Opinion clearly states that the expenses which were not properly documented were disallowed. The Court

_____

[11]. We note that the bankruptcy court's ruling on this point is called into question by our holding in Busy Beaver that not all clerical services are necessarily overhead. 19 F.3d at 848. Generally, a bankruptcy court should seek to determine if nonbankruptcy professionals charge their clients for these particular services. Id. at 849. But an applicant must offer evidence that the market practice is otherwise. Here, not only were these expenses improperly documented in the first instance, the bankruptcy court found they were never properly documented. Nor is there any indication that Zolfo Cooper presented evidence that these expenses are compensated in the nonbankruptcy context.

continues to disallow the expenses on the basis that they were never properly documented as was required by the Court." In re Allegheny Int'l, Inc., No. 88-448 (Bankr. W.D. Pa. Sept. 5, 1991) ("September 5, 1991, Order") (order clarifying denial of expenses). Although this statement is rather terse, it came at the end of a long fee application process. The bankruptcy court is obliged carefully to consider the documentation submitted by applicants for fees and expenses, but it is not required to provide elaborate findings after each request for reconsideration.

The bankruptcy court provided a thorough analysis of Zolfo Cooper's fee application in its August 21, 1990, Opinion, in which it granted most of Zolfo Cooper's requests even though it found "[n]one of the expenses listed in the petitions are properly documented." August 21, 1990, Opinion at 6. Its September 5, 1991, Order might have discussed more explicitly its consideration of the supplemental materials, but the context of the September 5, 1991, Order makes clear that the court considered the materials and found them wanting. The bankruptcy court answered the question Zolfo Cooper asked--whether the court had reached a decision regarding fees. This comports with the proper standard, which requires the court to consider supplemental materials where the initial application was in good faith. Here, the bankruptcy court considered the supplemental materials even though language in its August 21, 1990, Opinion suggests Zolfo Cooper's original request might not have met the good faith standard. We are satisfied that the bankruptcy court

properly considered the supplemental documentation submitted by Zolfo Cooper.  The bankruptcy court made clear it considered the documentation insufficient, and we find no error here.

IV.

For the foregoing reasons, we will affirm the district court.