**In re NORTHWESTERN CORPORATION, Reorganized Debtor.**

No. 03–12872 JLP.

United States Bankruptcy Court, D. Delaware.

May 5, 2005.

William Pierce Bowden, Ashby & Geddes, Paul D. Brown, William E. Chipman,

Jr., Victoria Watson Counihan, Scott D. Cousins, Monica Leigh Loftin, Dennis A. Meloro, Charles Michael Terrible, Greenberg Traurig, LLP, Evelyn J. Meltzer, Pepper Hamilton LLP, Wilmington, DE, Robert Lee Striker, Leonard, Street and Deinard, Minneapolis, MN, Charlene D. Davis, Gianclaudio Finizio, Donna L. Harris, Christopher Page Simon, Cross & Simon, LLC, John C. Phillips, Jr., Phillips, Goldman & Spence, Eric Michael Sutty, Wilmington, DE, for debtor.

Mark S. Kenney, Office of U.S.Trustee, Wilmington, DE, for trustee.

### MEMORANDUM OPINION WITH RESPECT TO FINAL FEE APPLICATION OF HOULIHAN, LOKEY, HOWARD & ZUKIN [1]

JOHN L. PETERSON, Bankruptcy Judge.

Houlihan, Lokey, Howard & Zukin ("Houlihan") was retained as Financial Adviser to the Official Committee of Unsecured Creditors pursuant to an Engagement Letter dated October 17, 2003. The scope of the engagement, which was clearly not as extensive as the Debtor's Financial Advisor, Lazard Frères & Co. LLC ("Lazard"), was to evaluate the assets and liabilities of the Debtor, analyze Debtor's financial and operating statements, its business plans and forecast, analyze DIP financing, use of cash collateral and adequate protection, provide valuation of assets, assess issues regarding sale of the Debtor,[2] analyze the Plan of Reorganization and explain it to various creditor constituencies, and provide testimony in court on behalf of the Committee. As to the latter matter, the record from the confir-

mation hearing reflects that Houlihan, together with Lazard, provided valuation testimony that the value of the Debtor's assets ranged between $1.4 to $1.67 billion, which the Court found reasonable and persuasive. (Confirmation Order, p. 29). These valuations reflected a downward adjustment of present value of QF liabilities to $140 million from over $320 million. Both advisers thus concluded that based on total claims of $2.2 to $2.3 billion, the debtor had a net negative equity of at least $586 million. (*Id.* at p. 80).

Houlihan's Engagement Letter provided for a monthly fee of $175,000.00, plus reimbursement of reasonable out-of-pocket expenses. [Docket No. 255, Exhibit "B"]. In addition to this handsome monthly fee, Houlihan was to be paid a "Transaction Fee" equal to $2.5 million, with reduction credit of 25% of the monthly fee for the seventh, eighth and ninth months, and a 50% reduction credit for all months after the tenth month. A qualifying "transaction" was defined to include confirmation of a chapter 11 plan of reorganization. Paragraph 5 of the Engagement Letter, provides in pertinent part that once approved, "the Debtor shall pay all fees and expenses as promptly as possible in accordance with the terms of this agreement, the Bankruptcy Code, the Bankruptcy Rules and applicable local rules and orders of the Bankruptcy Court." [3]

The Retention Order authorized Houlihan's employment effective October 1, 2003. [Docket No. 503, December 8, 2003]. The Retention Order provides, in pertinent part:

ORDERED, that, pursuant to Sections 328(a) and 1103 of the Bankruptcy

---

1. This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

2. No sale of the Debtor ever occurred.

3. In this case, due to thirteen months of retention, the reduction credit was $481,250.00.

Code and Rule 2014(a) of the Bankruptcy Rules, the Committee is hereby authorized to employ and retain Houlihan Lokey as its financial advisors effective as of October 1, 2003, on the terms set forth in the Application and this order, and to the extent consistent with the Application, this Order, and the Engagement Letter; and it is further

ORDERED, that Houlihan Lokey shall be compensated in accordance with the terms of the Engagement Letter, subject to the procedures set forth in the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any other applicable orders of this Court ....

The Retention Order concludes that during the pendency of the chapter 11 case, the Court shall retain exclusive jurisdiction to construe and enforce the terms of the Application to Employ, the Engagement Letter and the Retention Order.

In a supplement to Houlihan's Amended Twelfth and Final Fee Application, Houlihan requested approval of a Transaction Fee of $2,018,750.00 and approval of the flat monthly fees of $2,275,00.00, totaling $4,293,750.00, plus costs of $108,541.52 for the periods from September 30, 2003 through October 31, 2004. [Docket No. 2632]. According to Houlihan, its professionals billed a total of 4662.8 hours on this project. As calculated, the blended hourly rate for the total monthly fees was thus $487.90 per hour, the blended hourly rate for the Transaction Fee was $432.95 per hour, bringing the total hourly rate to $920.85.

Houlihan was paid the Transaction Fee in full in October 2004, before any application was filed seeking Court approval of such fee, which was in direct contravention of the Retention Order. During the February 10, 2005, hearing, the Court noted: "surprising to me, I see that Houlihan was paid a Transaction Fee of $2,018,750 before any order of the court was entered authorizing that fee." Houlihan postures the weak argument that the Engagement Letter allowed for the Transaction Fee payment without Court review or order because the Engagement Letter should be interpreted to trigger immediate payment upon occurrence of the transaction, namely, confirmation of the chapter 11 plan. That argument is improvident in and of itself because it totally ignores the well established provisions of the Bankruptcy Code demanding that the Court has an independent duty to review and pass upon professional fee applications before payment, and the Retention Order itself clearly requires such procedure.[4]

It is Houlihan's position that the test for approval of Houlihan's Final Fee Application must be based upon section 328(a) of the Code,[5] rather than section 330(a), because the Office of the U.S. Trustee has filed no objection to Final Fee Application. The Retention Order provides in this regard:

ORDERED, that, notwithstanding anything to the contrary herein or in the Engagement Letter, all of Houlihan Lokey's fees and expenses in this case, including, without limitation, the Transaction Fee, (as defined in the Engagement Letter), shall be subject to approval by this Court under the standard set forth in Section 328(a) of the Bankruptcy Code upon proper application by Houlihan Lokey in accordance with the

---

4. Indeed, testimony from Lazard's witness revealed that the Debtor made payment to Lazard of their $5.5 million Transaction Fee before applying for Court approval, which Lazard promptly returned to the debtor.

5. Unless otherwise indicated, all citations to statutory sections are to the Bankruptcy Code (the "Code", 11 U.S.C. § 101 *et seq.)*

applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and any other applicable orders of this Court; *provided however,* that the Office of the United States Trustee shall retain the right to object to Houlihan Lokey's request for the payment of a Transaction Fee pursuant to the standard set forth in Sections 330(a) of the Bankruptcy Code; . . . .

*In re Texas Securities, Inc.,* 218 F.3d 443, (5th Cir.2000), held that barring changed conditions, a court may not recompute a professional's compensation using a lodestar formula where the court has already approved a hybrid contingent fee/hourly rate formula pursuant to section 328(a). In *Texas Securities,* the retention order set forth the specific basis for the section 328(a) fee. The only condition allowing a court to examine the fixed fee under section 328(a) is where, notwithstanding such fixed rate,

> the court may allow compensation different from the compensation provided under such *terms* and *conditions* after the conclusion of such employment, if such *terms* and *conditions* prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions.

11 U.S.C. § 328(a) (emphasis added).

The Retention Order, however, did not "expressly and unambiguously state specific terms and conditions (*e.g.,* specific hourly rates or contingency fee arrangements) that are being approved pursuant to the first sentence of section 328(a), . . . ." *Zolfo, Cooper & Co. v. Sunbeam–Oster Co., Inc.,* 50 F.3d 253, 261 (3d Cir.1995). That specific provision provides for employment "on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis or on a contingent fee basis." 11 U.S.C. § 328(a). The Retention Order

states, somewhat ambiguously, that "all of Houlihan Lokey's fees and expenses in this case, including, without limitation, the Transaction Fee . . . shall be subject to approval by this Court under the standard set forth in Section 328(a) of the Bankruptcy Code . . . ." I conclude that this language means the Court may review the monthly fees and Transaction Fee to determine if they are "reasonable" on "an hourly basis." The "improvident" test comes into play once the reasonableness test is satisfied, which is "shall be subject to approval by the court." *See* 11 U.S.C. § 328(a).

*In re Drexel Burnham Lambert Group, Inc.,* 133 B.R. 13 (Bankr.S.D.N.Y.1991), put its finger on one of the serious problems present in this fee request when it noted:

> . Finally, the application must explain how the investment banker/advisor will eliminate, or at least reduce, the duplication of effort Judge Paskey alluded to in *Hillsborough,* 125 B.R. at 838–39, where there are armies of professionals apparently doing the same thing as the investment banker/advisor. Specifically, the intention is to avoid accountants and investment bankers/advisors massaging the same numbers twice when one trip to the masseuse would generally suffice.

*Id.* at 27. Here, one only has to review the Order Confirming Debtor's Second Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, where the Court recites the duplication of the effort of Lazard and Houlihan in his finding:

> Both Lazard Freres & Co LLC ("Lazard") and Houlihan, Lokey, Howard & Zukin, Inc. ("Houlihan") used the three standard valuation approaches . . . . Lazard determined that the Enterprise Value of the Reorganized Debtor approximated the midpoint of the range of

these methodologies, $1.5 million. Using the same methodologies, Houlihan independently arrived at a range of value for the Reorganized Debtor of approximately $1.4 billion to $1.67 billion. (Confirmation Order, pp. 28–29).

Finally, the retention agreements reflect some similarities in the two advisors' employment duties, however, Lazard's duties are clearly more expansive. Lazard duties subsume and duplicate the Houlihan retention obligations, so much so that is difficult for this Court to accept why duplication of effort on common matters should require two substantial transaction fees—one for $5.5 million (Lazard) and another for $2,018,750 (Houlihan), especially in light of the fact that monthly compensation totaling $4,875,000.00 was paid to the two advisors based on 7,875 hours worked over a short period of only thirteen months.

■ Accordingly, based on all of the circumstances in this case, and particularly the duplication of work by the financial advisers, and considering the total blended hourly rate of each adviser, Lazard at $1711.58 and Houlihan at $920.85,[6] I determine, in light of the monthly compensation paid to each firm, that the Transaction Fees must be reduced to a reasonable level.

Houlihan's Memorandum in support of the Transaction Fee cites *In re UDC Homes*, 203 B.R. 218 (Bankr.D.Del.1996), as being an all fours with Houlihan's Final Fee Application. In, *UDC Homes*, Houlihan was retained as financial adviser to the Preferred Shareholders at a flat fee of $75,000 per month. *Id.* at 220. The *UDC Homes* Court analyzed the services performed and applied an hourly rate analysis based on information supplied by Houli-

han, who conceded that it sometimes billed on an hourly basis to non-bankruptcy clients. *Id.* at 224. Ironically, the hourly rate would have been as much as $3,300 per hour during one month when activity was minimal. The *UDC Homes* Court found the application deficient in terms of comparative data for similar charges outside bankruptcy, and therefore reduced Houlihan's monthly fees from $332,499 to $230,000, thereby applying the traditional Lodestar method (number of hours times a reasonable hourly rate) to the "final" monthly retainer. Thus, the *UDC Homes* Court applied section 330(a) analysis to the monthly fee.

■ Moreover, the case authorities are fairly uniform in holding that financial advisors are subject to the requirements of Federal Rule of Bankruptcy Procedure 2016(a), especially with respect to fixed monthly fee arrangements. *See, e.g., In re Hillsborough Holdings Corp.*, 125 B.R. 837, 840–41 (Bankr.M.D.Fla.1991). The *Hillsborough* Court cited *In re Gillett Holdings, Inc.*, 137 B.R. 475 (Bankr. D.Colo.1992), *In re Mortgage & Realty Trust* 123 B.R. 626 (Bankr.C.D.Cal.1991), and *In re Baldwin–United Corp.*, 79 B.R. 321 (Bankr.S.D.Ohio 1987). The *Mortgage & Realty Trust* Court opined the adviser can always decide not to undertake bankruptcy work, but if it does take such work, it must comply with the legal requirements of the Code and Bankruptcy Rules. The *Mortgage & Realty Trust* Court then refused to approve a monthly retainer payment to the debtor's financial advisor, acknowledging such retainer may be permissible under section 328, but it would nevertheless still be subject to evidentiary justification before and after the services

---

**6.** At hearing, Houlihan's blended hourly rate was explained to be lower because Houlihan had to come up to speed on the case, while

Lazard had conducted a substantial amount of work for the Debtor pre-petition.

were rendered, thereby applying Bankruptcy Rule 2016(a).[7]

As to the duplication of services by the two financial advisors retained in this case, I must assume from the testimony of Messrs. Yearly and Greer that the financial advisors performed services in accordance with their respective retention agreements. A comparison of the proposed services detailed in the agreements and evidently rendered by the advisors are compared as follows.

*Lazard:*

(a) A review and analysis of the Company's business, operations and financial projections;
(b) Evaluating the Company's potential debt capacity in light of its projected cash flows;
(c) Assisting in the determination of a capital structure for the Company;
(d) Assisting in the determination of a range of values for the Company on a going concern basis;

(e) Advising the Company on tactics and strategies for negotiating, and participating in meetings and negotiation, with its creditors, regulators and other parties in interest (the "Stakeholders");
(f) Advising the Company on the timing, nature, and terms of new securities, other consideration or other inducements to be offered pursuant to the Restructuring;
(g) Advising and assisting the Company in evaluating potential capital markets transactions of public or private debt or equity offerings (a "Financing") by the Company, and, on behalf of the Company, evaluating and contacting potential sources of capital and assisting the Company in negotiating such a Financing;
(h) Assisting the Company in preparing documentation within our area of expertise that is required in connection with Restructuring;
(i) Assisting the Company in identifying and evaluating candidates for a potential Sale Transaction, advising the Company in connection with negotiations and aiding

*Houlihan:*

(a) Evaluating the assets and liabilities of the Debtor;
(b) Analyzing the financial and operating statements of the Debtor;
(c) Analyzing the business plans and forecasts of the Debtor;
(d) Evaluating the prospects for debtor in possession financing (if any), cash collateral usage and adequate protection therefore and the prospects for any exit financing in connection with any plan of reorganization and any budgets relating thereto;
(e) Providing such specific valuation or other financial analyses as the Committee may require in connection with the Cases;

(f) Assessing the financial issues and options concerning (a) the sale of the Debtor, or any of its assets, and (b) any plan of reorganization (collectively, the "Plan");
(g) Analyzing and explaining the Plan to various constituencies; and

(h) Providing testimony in Bankruptcy court, on behalf of the Committee, if necessary.

7. Rule 2016(a) provides, in pertinent part:
    An entity seeking interim or final compensation for services, or reimbursement of necessary expenses, from the estate shall file an application setting forth a detailed statement of (1) the services rendered, time expended and expenses incurred, and (2) the amounts requested.

in the consummation of a Sale Transaction[1];

(j) Attending meetings of the Company's Board of Directors and its committees;

(k) Providing testimony, as necessary, with respect to matters which have been engaged to advise you on in any proceeding before the Bankruptcy Court; and

(*l*) Providing the Company with other general restructuring advice.

1 As used in this letter, the term "Sale Transaction" means any transaction or series of transactions involving (a) an acquisition, merger, consolidation, or other business combination pursuant to which the business or assets of the Company are, directly or indirectly, combined with another company; (b) the acquisition, directly or indirectly, by a buyer or buyers (which term shall include a "group" of persons as defined in Section 13(d) of the Securities Exchange Act of 1934, as amended), of equity interests or options, or any combination thereof constituting a majority of the then outstanding stock of the Company or possessing a majority of the then outstanding voting power of the Company (except as may occur with current Stakeholders as a result of a Restructuring); (c) any other purchase or acquisition, directly or indirectly, by a buyer or buyers of significant assets, securities or other interests of the Company or (d) the formation of a joint venture or partnership with the Company or direct investment in the Company for the purpose of effecting a transfer of a significant interest in the Company to a third party. Sale Transactions shall exclude any sale of only the Expanets and Blue Dot assets.

According to Lazard's testimony and Final Fee Application, Lazard raised the DIP financing, negotiated a rate reduction of 1.75% on $390 million of credit (saving $6.8 to $7 million per year), developed the business plan, developed valuation, analyses and debt capacity reports, assisted in preparation of the disclosure statement, negotiated a favorable settlement with the Montana Public Service Commission, calling for a 8.5% rate of return on rate base and a rate freeze through September 2006, developed a consensual plan of reorganization, gave expert testimony at the confirmation hearing, provided valuation analysis on the stock issue, assisted in evaluating NYSE and NASDAQ listing requirements, responded to interested prospective purchases of assets, assisted in development of information forwarded to creditors, assisted and advised Debtor in connection with meetings with credit rating agencies, and gave advice on proposed exit financing of $125 million. Lazard states: "By all accounts the Debtor's restructuring was an overwhelming success

and Lazard played a critical role in this success." The Lazard Memorandum Opinion and Order allowing fees addresses the short-falls of the reorganization, which clearly dismisses the above laudatory statement.

Houlihan, on the other hand, summarizes its agreed services as follows:

(a) Strategic Discussions, Planning & Review;

(b) Financial and Operational Due Diligence;

(c) Valuation and Corporate Finance Work;

(d) Financial Analysis and Monitoring;

(e) Correspondence, Meetings and Discussions with Parties-in-interest; and

(f) Case Administration.

Its activities were admittedly directed toward the Official Committee of Unsecured Creditors rather than the overall project of the Debtor's reorganization.

In *UDC Homes*, the advisors provided the court with a list of thirty-two domestic transactions having a value between $200 and $500 million dollars, where the advisor was paid a percentage of the transaction value,[8] ranging from .5% to 1.5% and averaged at .9%. 203 B.R. at 222–23. The advisors also provided the court with a list of thirty-one restructurings involving values from $102 million to $2.5 billion, where the average transaction fee was 1.09% of the transaction's accreted security value. *Id.* The *UDC Homes* Court concluded that the .72% sought by the advisors, based on the two benchmarks, satisfied the test of reasonableness within the standards set forth in *Busy Beaver*. *Id.* at 223. *UDC*

*Homes* is not a comparable case to the present situation.

Lazard submitted in evidence Exhibit 1, a two-part exhibit entitled "Debtor Advisor Restructuring Fees" ("A") and acquisition listings ("B").[9] Neither Exhibit "A" nor "B" satisfy the express provisions of section 330(a)(3)(E), which requires the Court to consider: "whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title." 11 U.S.C. § 330(a)(3)(E). Clearly Exhibit "A" fails that test because, as admitted by Mr. Yearly, the restructuring success fees provided in the Exhibit was a percentage of total funded debt based primarily upon cases in chapter 11 bankruptcy, including NorthWestern, and not restructures "in cases other than cases made this title." As to Exhibit "B," such exhibit is a resume of cases involving sale transactions and fees based on a percentage of the sale price, which is irrelevant because no sale occurred in this chapter 11 case. Consequently, Exhibit 1 does not present credible evidence of the percentage fee concept to establish the validity of the reasonableness of the requested transaction fees, both as to Lazard and Houlihan.

### CONCLUSION

■ Based on the foregoing, I accept and find the blended hourly rate of $900.00 as representative of the market. However, I cannot overlook the excessive duplication of effort between Houlihan and Lazard. For that reason, I find improvident

---

**8.** *UDC Homes* involved a stock purchase agreement. 203 B.R. at 222–23. The comparative data at issue in *UDC Homes* analyzed domestic transactions during the period between January 1, 1992 through November 28, 1995, and restructuring fees during the dur-

ing the period of March 1990 through the second quarter of 1995. *Id.*

**9.** A copy of Exhibit 1 is attached to the Fee Auditor's Final Report regarding Lazard's Final Fee Application [Docket No. 2570] as Response Exhibit A and B.

this duplication of services, which occurred after the retention order was entered, and thus could not have been foreseen by the Court at the time Houlihan's application was approved under section 328(a). Therefore, the total request of $4,293,750.00 will be reduced to $3,156,250.00. This reduced amount represents a 50% reduction of the flat monthly fee of $2,275,000.000, thereby reducing that rate to $1,137,500.00, coupled with the Transaction fee of $2,018,750.00. I award Houlihan a final fee of $3,156,250.00, plus reasonable out-of-pocket expenses of $93,109.40.