348 F.3d 390
 In re FEDERAL MOGUL-GLOBAL INC.; T & N Limited
Committee of Equity Security Holders of Federal-Mogul Corporation, Appellant
v.
Official Committee of Unsecured creditors.
 No. 02-4166.
 United States Court of Appeals, Third Circuit.
 Argued on July 23, 2003.
 Filed October 31, 2003.
 
 I. Connor Bifferato, Megan N. Harper, Bifferato, Bifferato & Gentilotti, Wilmington, DE, David F. Heroy (argued), Kevin Y. Pak, Andrew B. Cohen, Michael Yetnikoff, Bell, Boyd & Lloyd, LLC, Chicago, IL, for Appellant.
 Charlene D. Davis (argued), James Tobia, The Bayard Firm, Wilmington, DE, Peter D. Wolfson, Andrew P. Lederman, Sonnenschein, Nash & Rosenthal, New York, NY, for Appellees.
 Before ALITO, FUENTES, and BECKER, Circuit Judges.
 OPINION OF THE COURT
 ALITO, Circuit Judge.
 
 
 1
 This appeal concerns a Bankruptcy Court order issued in the course of Chapter 11 reorganization proceedings involving Federal-Mogul Global, Inc. ("Federal-Mogul") and its various subsidiaries (collectively the "Debtors"). The Official Committee of Equity Security Holders of Federal-Mogul Corp. (the "Equity Committee") appeals an order of the United States District Court for the District of Delaware affirming an order of the United States Bankruptcy Court for the District of Delaware. The Bankruptcy Court's order granted the Equity Committee's application to retain Deloitte & Touche LLP ("D & T") to give the Committee financial advice in connection with the Debtors' reorganization, but the order limited the amount that D & T could charge the Debtors' estates for its services to $30,000 per month. In capping D & T's fees, the Bankruptcy Court expressed a belief that the debtor was likely insolvent and that the appointment of the Equity Committee might not have been justified. In addition, the Bankruptcy Court relied on its belief that the Debtors' financial advisors had already compiled a significant amount of financial data that could be made available to the Committee and that there was consequently no need for the Equity Committee's advisors to duplicate that research.
 
 
 2
 The Equity Committee challenges the portion of the order limiting D & T's compensation on two grounds. First, the Committee contends that the cap on D & T's fees was not authorized under 11 U.S.C. § 328(a) and was unsupported by the evidence before the Bankruptcy Court. Second, the Committee maintains that 11 U.S.C. § 1103(b) prohibited the Bankruptcy Court from directing the Committee to rely on financial data compiled by the Debtors' advisors. For the reasons stated below, we hold (1) that 11 U.S.C. § 328(a) authorizes Bankruptcy Courts to devise and impose caps on the compensation of financial advisors retained in connection with Chapter 11 proceedings; and (2) that 11 U.S.C. § 1103(b) does not prohibit a Bankruptcy Court from instructing a financial advisor to an equity security holders' committee to rely on data previously compiled by professionals retained by the debtors in a reorganization proceeding. However, we find that the record contains insufficient information to permit us to determine the factual basis for the cap. Accordingly, we vacate the Bankruptcy Court's order and remand the case for further proceedings consistent with this opinion.
 
 I.
 
 3
 The Debtors are manufacturers and distributors of automotive parts. On October 1, 2001, the Debtors filed petitions for relief pursuant to Chapter 11 of the Bankruptcy Code. On October 4, 2001, the Bankruptcy Court consolidated the petitions for adjudication in a single proceeding. On October 23, 2001, the United States Trustee (the "Trustee") appointed the Official Committee of Unsecured Creditors of Federal-Mogul Corp. (the "Creditors Committee") to represent the interests of the Debtors' unsecured creditors in the reorganization. On October 24, 2001, the Trustee appointed the Official Committee of Asbestos Personal Injury Claimants (the "Asbestos Committee") to represent the interests of persons claiming injury due to asbestos contained in the Debtors' products. The Bankruptcy Court authorized both the Creditors and Asbestos Committees to retain multiple accounting firms to assist them during the reorganization proceeding. On June 12, 2002, the Trustee appointed the Equity Committee.
 
 
 4
 On August 7, 2002, the Equity Committee submitted an application, pursuant to 11 U.S.C. §§ 328(a) and 1103 and Fed. R.Bankr.Proc.2014(a) and 2016(b), to retain D & T as financial advisors in connection with the Debtors' reorganization. The application stated that D & T would serve the Equity Committee by valuing the Equity Committee's potential recovery under a reorganization plan, investigating the Debtors' financial condition, assisting in the negotiation of the Debtors' Chapter 11 plan, rendering expert testimony, and providing any other services the Equity Committee required in connection with the case. App. II at 92-94. To justify D & T's retention, the Equity Committee noted that the Debtors and the creditors' committees involved in the case had retained their own financial professionals, and the Equity Committee maintained that the employment of D & T was needed to create a "level playing field." Id. at 94-95. The Equity Committee also cited its need to obtain an independent analysis of financial data compiled by the Debtors. Id. at 94-95. Under the Equity Committee's proposal, D & T would be compensated at an hourly rate, and its compensation would be capped at $200,000 per month for the first five months of D & T's employment and limited to $125,000 per month thereafter. Id. at 95.
 
 
 5
 The Creditors Committee filed objections to the Equity Committee's application. The Creditors Committee contended that the Bankruptcy Court should not authorize D & T's retention because (1) the Equity Committee did not stand to receive any value from the Debtors' reorganization, since the Debtors were insolvent; and (2) if retained by the Equity Committee, D & T would labor under a conflict of interest. The Creditors Committee accompanied its objection with a table of figures that, in the Committee's view, showed that the Debtors were insolvent. The Creditors Committee estimated that the Debtors' total commercial debt was approximately $5.7 billion and noted that Federal-Mogul "last reported its estimate of asbestos liability at over $1.6 billion, and the asbestos committee has opined that the number is a significant multiple thereof." Id. at 135. On August 26, 2002, the Asbestos Committee joined in the Creditors Committee's objection.
 
 
 6
 On August 28, 2002, the Bankruptcy Court held a hearing on the Equity Committee's application. The Bankruptcy Court heard argument from the parties but did not take evidence. The Bankruptcy Court expressed skepticism on two grounds regarding the amount of compensation that the Equity Committee requested for D & T. First, the Bankruptcy Court agreed with the Creditors Committee's contention that, since the Debtors were probably insolvent, the Equity Committee was not likely entitled to any value from the Debtors' reorganization.[1] Id. at 150. Second, even if the Equity Committee could obtain value from the Debtors' reorganization, the Bankruptcy Court believed that D & T could rely on financial data already compiled by the professionals serving the Debtors. See id. at 147-48 ("[I]t seems to me that we've got so much accounting information here that if you added up all the numbers and divide [sic] it by four you would probably get the right one."); id. at 157 ("You don't have to go back and put together all new work product."). In the Bankruptcy Court's view, the Debtors had the incentive to maximize the value that the Equity Committee could receive from the reorganization proceeding, and thus the Debtors would likely provide any information the Equity Committee requested. Id. at 167. If the Debtors failed to provide the Equity Committee with such information, the Bankruptcy Court observed, it could always order them to do so. Id. at 186.
 
 
 7
 On September 13, 2002, the Bankruptcy Court entered an order authorizing the Equity Committee to retain D & T and capping the monthly fees that D & T could charge the Debtors' estates at $30,000 per month. On September 18, 2002, the Equity Committee appealed the Bankruptcy Court's order to the District Court, claiming (1) that the fee cap "deprive[d] the Equity Committee from [sic] being able to obtain adequate financial advice," (2) that the Bankruptcy Code does not authorize the imposition of a cap on financial professionals' compensation, and (3) that the Bankruptcy Court clearly erred in finding that the Debtors were insolvent. Id. at 34. The Creditors Committee cross-appealed, claiming, for the reasons set forth in its objection to the Equity Committee's application, that the Equity Committee was not entitled to retain financial advisors.
 
 
 8
 On October 29, 2002, the District Court issued an order affirming the Bankruptcy Court's decision. In relevant part, the District Court described the applicable law as follows:
 
 
 9
 Section 1103(a) of the Bankruptcy Code provides that a duly constituted committee may "with the court's approval" select and authorize the employment of attorneys, accountants and other professionals. Section 328(a) makes the terms of such employment also subject to approval by court [sic].
 
 
 10
 The Bankruptcy Court must consider the "all relevant factors," [sic] including the time spent, rates charged and "whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title." 11 U.S.C. § 330(a)(3)(C).
 
 
 11
 App. I at 2. Applying this standard, the District Court agreed with the Bankruptcy Court's conclusion that "[t]he proposed scope of work for [D & T] ... was largely duplicative of the work of the several teams of financial professionals already employed by several constituencies." Id. at 3. In the District Court's view, it was particularly important to avoid charging the Debtors more fees than necessary, as "tremendous fee obligations have been incurred by financial professionals in this large and complex case and ... they constitute a burden on the estate of this insolvent debtor." Id. Moreover, according to the District Court, the other committees involved in the case "appeared willing to give the Equity Committee access to the financial information they had developed." Id. In light of these factors, the District Court concluded, the $30,000 fee cap was appropriate, as that amount "would permit financial advisors to advise the [Equity] Committee based upon data developed by the other constituencies" without charging the Debtors for unnecessary services. Id. at 4. The Equity Committee then took this appeal.
 
 
 12
 On appeal, the Equity Committee raises three issues. First, the Equity Committee argues that 11 U.S.C. § 328(a) did not authorize the Bankruptcy Court to impose its own caps on D & T's compensation at the outset of its retention. Second, the Equity Committee contends that the District Court erred in suggesting that the Equity Committee could rely on financial data compiled by the Debtors' financial professionals because the Debtors' had "a conflicting interest." Appellant's Br. at 27. Finally, the Equity Committee maintains that, even if the Code permits the imposition of fee caps, the Bankruptcy Court's decision to impose the fee cap in the present case was not supported by the record.[2]
 
 II.
 
 13
 We first consider the Equity Committee's argument that the Bankruptcy Court was not authorized under 11 U.S.C. § 328(a) to impose a cap on D & T's monthly fees. We begin by reviewing the relevant Code sections.
 
 A.
 
 14
 Title 11 United States Code, § 1102(a)(1), authorizes a United States Trustee to appoint "committees ... of equity security holders as the ... trustee deems appropriate." 11 U.S.C. § 1102(a)(1). A committee appointed under 11 U.S.C. § 1102 has the power to "select and authorize the employment ... of one or more attorneys, accountants, or other agents, to represent or perform services for such committee." 11 U.S.C. § 1103(a). Under 11 U.S.C. § 328(a), the employment of a professional requires approval by a Bankruptcy Court. Section 328(a) states:
 
 
 15
 The trustee, or a committee appointed under section 1102 of this title, with the court's approval, may employ or authorize the employment of a professional person under section 327 or 1103 of this title, as the case may be, on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, or on a contingent fee basis. Notwithstanding such terms and conditions, the court may allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employment, if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions.
 
 
 16
 Thus, a committee appointed under 11 U.S.C. § 1102(a)(1), may, "with the approval" of the Bankruptcy Court, employ a professional "on any reasonable terms and conditions of employment, including [employment] on an hourly basis." Under 11 U.S.C. § 330(a)(1), such a professional may apply to receive fees from the bankruptcy estate after the professional has rendered services to the committee. Generally, a Bankruptcy Court reviewing a professional's fee application under Section 330(a)(1) must award that professional a fee that is "reasonable" in light of certain factors set out in that provision.[3] See 11 U.S.C. § 330(a)(1) (authorizing a Bankruptcy Court to award a professional "reasonable compensation for actual, necessary services rendered"); Zolfo, Cooper & Co. v. Sunbeam-Oster Co., 50 F.3d 253, 261 (3d Cir.1995) (stating that a professional's "claim to money from the bankruptcy estate is limited to a claim for reasonable fees"). But when a Bankruptcy Court has "fix[ed] ... terms and conditions" of employment for an application to employ that was approved, the Court may allow compensation on different terms or conditions only if the court's initial approval "prove[s] to have been improvident in light of developments not capable of being anticipated at the time" of approval. 11 U.S.C. § 328(a); see also In re B.U.M. Int'l., Inc., 229 F.3d 824, 829 (9th Cir.2000) ("[A] bankruptcy court may not conduct a[n] ... inquiry into the reasonableness of [a professional's] fees and their benefit to the estate if the court already has approved the professional's employment under 11 U.S.C. § 328."); In re Nat'l. Gypsum Co., 123 F.3d 861, 862 (5th Cir.1997) ("Under... § 328[a] professional may avoid ... uncertainty by obtaining court approval of compensation agreed to with [a committee].... Thereafter, that approved compensation may be changed only ... `if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions.'"); In re Benassi, 72 B.R. 44, 47 (1987) (" § 330(a)(1) does not supplant § 328(a) and give the [bankruptcy] judge free reign to void a previously authorized employment agreement for a percentage fee."); 3 Collier on Bankruptcy § 328.03[1] (15th ed. rev.2002) ("A court may not revisit [its] prior determination as to the `reasonableness' of an agreement previously approved [pursuant to Section 328(a) ] unless and until it determines that the terms and conditions proved to be `improvident.'"). With this framework in mind, we turn to the specific arguments advanced by the Equity Committee.
 
 B.
 
 17
 The Equity Committee first suggests that the Bankruptcy Court in this case exceeded its authority by adding its own caps on D & T's fees. As we understand its argument, the Equity Committee seems to contend that a Bankruptcy Court, when presented with an application to employ a professional, must either approve the application in toto without alteration or it must reject the application.[4] We do not agree.
 
 1.
 
 18
 The language of Section 328(a) does not support the Equity Committee's argument. As noted, Section 328(a) states in relevant part that a committee, "with the court's approval," may employ a professional "on any reasonable terms and conditions of employment." This language may easily be interpreted to mean that the Court may approve the employment of a professional on any terms and conditions that the Court finds necessary to satisfy the requirement of reasonableness.[5]
 
 2.
 
 19
 The Equity Committee's reading of Section 328(a) also makes little sense. In the view of the Equity Committee, if a Bankruptcy Court is presented with an application containing an unreasonable term, the Court's only option is to reject the application. But even if this view were correct, a Bankruptcy Court, in rejecting such an application, could surely explain why it found the term in question to be unreasonable, and the Court surely could entertain an amended application that is consistent with the Court's expressed view of what is reasonable. Thus, even on the Equity Committee's view, a Bankruptcy Court could achieve the same result that is produced by approving an application with modifications. The only difference is that the Equity Committee's reading would require a needlessly complicated and burdensome procedure. We do not think that Section 328(a) was intended to produce such a result.
 
 3.
 
 20
 Our decision in Zolfo, Cooper & Co. v. Sunbeam-Oster Co., 50 F.3d 253, 261 (3d Cir.1995), supports our conclusion that a Bankruptcy Court need not approve or reject an application as presented but may approve an application with modified terms that the Court finds necessary to render the proposed employment reasonable. In Zolfo, Cooper & Co., the debtors filed an application seeking to retain Zolfo, Cooper & Co. ("Zolfo") as financial advisors. The application proposed certain hourly rates for Zolfo. The Bankruptcy Court entered an order stating only that the debtors were "authorized to retain [Zolfo] ... to perform the services as set forth in" the debtors' application. Zolfo, Cooper & Co., 50 F.3d at 262. When Zolfo later applied for compensation from the estate, the Bankruptcy Court awarded Zolfo lower hourly rates than the debtors had sought in the application. Zolfo appealed, claiming that "the bankruptcy court could [not], consistent with [11 U.S.C.] § 328(a), reach an independent determination of the fees to which Zolfo ... was entitled without a finding that the rates set forth in Zolfo['s]... retention affidavit were improvident." Id. at 261. Zolfo's argument relied on the premise that the Bankruptcy Court had implicitly approved Zolfo's hourly rates under Section 328(a) by authorizing Zolfo's employment without taking exception to its proposed fee structure. We rejected this argument, stating that "[i]f the order [approving a professional's retention] does not expressly and unambiguously state specific terms and conditions (e.g. specific hourly rates or contingency fee arrangements) that are being approved pursuant to the first sentence of section 328(a), then the terms and conditions are merely those that apply in the absence of specific agreement." Id. (quoting In re C & P Auto Transp., Inc., 94 B.R. 682, 685 n. 4 (Bankr. E.D.Cal.1988)). Since the order authorizing Zolfo's retention said nothing about Zolfo's hourly rates, the order could not "bind the court to particular terms and conditions of compensation." Id. at 262.
 
 
 21
 Zolfo, Cooper & Co. makes it clear that a Bankruptcy Court may approve some of the terms and conditions proposed in an employment application while rejecting others.[6] This point is implicit in Zolfo, Cooper & Co.'s holding that the Bankruptcy Court's approval of the application to retain Zolfo did not necessarily imply approval of the hourly rate sought in the application. If the Bankruptcy Court could not approve the application without approving all of its terms, there would have been no need to ask whether the Bankruptcy Court had specifically approved Zolfo's hourly rates. See also B. U. M. Int'l., 229 F.3d at 829 (holding that Section 328(a) permits a Bankruptcy Court to approve a professional's retention but "specifically reserve[] the right to approve the fees"); Unsecured Creditors' Comm. v. Puget Sound Plywood, Inc., 924 F.2d 955, 960 (9th Cir.1991) ("[E]ven if the bankruptcy court approved an hourly rate [under Section 328(a) ], if it did not fix the number of allowed hours, that matter still would be subject to the court's review."); In re Northeast Express Reg'l. Airlines, Inc., 235 B.R. 695, 699 (Bankr.D.Maine 1999) (holding that Section 328(a) authorizes a Bankruptcy Court to approve a professional's employment with the caveat that "all fees and expenses shall remain subject to court approval"); In re Olympic Marine Servs., 186 B.R. 651, 654 (Bankr. E.D.Va.1995) (holding that Section 328(a) permits a Bankruptcy Court to approve an employment application while making the "compensation award ... subject to the court's `further review'"); In re Warrior Drilling & Eng'g. Co., 18 B.R. 684, 693 (Bankr.N.D.Ala.1981) (holding that because the Bankruptcy Court did not specifically approve the fee retainer sought in an employment application, the court was not bound to adhere to that arrangement under Section 328(a)). We consequently reject the Equity Committee's contention that under 11 U.S.C. § 328(a) a Bankruptcy Court must approve or reject an application to employ a professional without modification.
 
 C.
 1.
 
 22
 The Equity Committee's primary argument concerning 11 U.S.C. § 328(a) is that the Bankruptcy Court was bound to approve its application to employ D & T simply because the application proposed employment on an hourly basis. The Equity Committee notes that Section 328(a) permits a professional to be employed "on any reasonable terms and conditions of employment, including ... on an hourly basis." The Equity Committee then states that "[s]ince Deloitte was to have been employed on a hourly basis, the Application easily met the requirements of [Section 328]." Appellant's Br. at 22. Although the Equity Committee does not spell out the steps of its reasoning, our best understanding of the Equity Committee's argument is as follows: under Section 328(a) it is reasonable to employ a professional on an hourly basis; employment on an hourly basis means compensation for as many hours of work as are needed to perform the assigned task; and therefore the absence of the caps imposed by the Bankruptcy Court did not render the terms and conditions of employment proposed in the application unreasonable. This argument is dependent on the proposition that any arrangement involving employment on an hourly basis is reasonable, but that proposition is plainly incorrect.
 
 
 23
 The statutory language on which the Equity Committee relies — which permits employment "on any reasonable terms and conditions ..., including ... on an hourly basis" — at most means that the concept of employment at an hourly rate is "reasonable," i.e., that an application cannot be rejected on the ground that it proposes to pay the professional on an hourly basis.[7] Section 328(a) does not refer to employment "on any hourly basis," and it would be absurd to read Section 328(a) to mean that employment "on any hourly basis" — $10,000 per hour? — is necessarily reasonable. Accordingly, a Bankruptcy Court must be allowed to review the reasonableness of a proposed hourly fee, and if a Bankruptcy Court can review the reasonableness of that aspect of a proposed employment, we see no reason why a Bankruptcy Court may not also review the reasonableness of the way in which a proposed fee arrangement deals with the question of a cap on the fees that may be awarded to a professional employed on an hourly basis.
 
 2.
 
 24
 It may be argued that a Bankruptcy Court may in effect impose a cap on the fees awarded pursuant to the employment of a professional at an hourly rate but that the Bankruptcy Court cannot take this action until the services have been rendered and compensation is sought under 11 U.S.C. § 330(a)(1). This argument, however, cannot stand up. If all features of a proposed arrangement to employ a professional on an hourly basis (including the presence or absence of a cap) are regarded as part of a single term or condition of employment, then a Bankruptcy Court cannot approve employment on an hourly basis without also approving the application's treatment of the cap issue. This would mean that, if the Court approved employment on an hourly basis, the Court would be obligated to allow the professional to be compensated in accordance with the way in which the application treats the cap issue unless such treatment proves "to have been improvident in light of developments not capable of being anticipated at the time" of approval. In other words, on this reading, if a Bankruptcy Court approved an application that lacks a cap, the Court could not later cap the fees unless the need for a cap could not have been anticipated at the time of approval. We cannot believe that the Code was intended to produce such a result.
 
 
 25
 This problem cannot be escaped by regarding employment on an hourly basis and the cap issue as separate terms or conditions of employment. On that reading, the language of Section 328(a) on which the Equity Committee relies would plainly provide no support for its position. As noted, the Equity Committee contends that the language of Section 328(a) means that employment on an hourly basis is necessarily a reasonable term or condition of employment. But even if we were to agree, if the cap issue is a separate term or condition, the Equity Committee's argument would collapse.
 
 
 26
 At oral argument, the Equity Committee advanced the alternative position that the amount of a professional's monthly compensation is not a "term or condition of employment" within the meaning of 11 U.S.C. § 328(a), and that only 11 U.S.C. § 330(a)(1) — which governs awards of compensation once a professional has actually rendered services — permits a Bankruptcy Court to evaluate the fee amount for reasonableness. The Equity Committee pointed out that Section 328(a) says that "reasonable terms and conditions ... includ[e]" retention "on an hourly basis," but does not mention the amount that a professional may be paid. In the Equity Committee's view, this implies that the latter is not a term or condition of employment under Section 328(a).
 
 
 27
 For three reasons, we reject the contention that Section 328(a) excludes the amount of a professional's compensation from the class of "reasonable terms and conditions" by negative implication. First and foremost, we are guided by Congress's statement that the word "including" in the Bankruptcy Code is "not limiting." 11 U.S.C. § 102(3); see also Am. Surety Co. v. Marotta, 287 U.S. 513, 517, 53 S.Ct. 260, 77 L.Ed. 466 (1933) ("In definitive provisions of statutes and other writings, `include' is frequently, if not generally, used as a word of extension or enlargement rather than as one of limitation or enumeration."). Accordingly, Section 328(a) is properly read to say that "reasonable terms and conditions" include, but are not limited to, retention on a retainer, on an hourly basis, or on a contingent fee basis.
 
 
 28
 Second, in ordinary language, the amount of a professional's monthly compensation is certainly a "term or condition" of that professional's employment. See, e.g., 29 U.S.C. § 158(d) (defining collective bargaining as "meet[ing] at reasonable times and confer[ring] in good faith with respect to wages ... and other terms and conditions of employment").
 
 
 29
 Third, the notion that the amount of a professional's compensation is not a term or condition of employment under Section 328(a) is contrary to precedent interpreting that provision. See, e.g., In re Texas Sec., Inc., 218 F.3d 443, 445 (5th Cir.2000) ("Section 328 applies when the bankruptcy court approves a particular rate or means of payment.") (emphasis added); In re Kurtzman, 220 B.R. 538, 542 (S.D.N.Y.1998) ("[U]nder 11 U.S.C. § 328(a) a court may disapprove a trustee's choice of counsel if the proposed rate of compensation is not reasonable.") (emphasis added). Accordingly, the total amount of money that a professional is allowed to collect over any fixed period of time is a "term or condition of employment" within the meaning of Section 328(a), and a Bankruptcy Court, in approving an application to employ a professional on an hourly basis, may review the application's treatment of the cap issue and may approve the application subject to a cap that the Court finds to be necessary in order to satisfy the statutory requirement of reasonableness.
 
 3.
 
 30
 Our interpretation of Section 328(a) is consistent with that of other courts. In In re Lytton's, 832 F.2d 395 (7th Cir. 1987), the Seventh Circuit read Section 328(a) to permit a Bankruptcy Court to fix a contingent fee schedule at the commencement of a professional's employment. See Lytton's, 832 F.2d at 400 ("Section 328 .... does not prohibit [a Bankruptcy Court from] setting a contingent fee schedule.... [T]he language of section 328 expressly allows setting a rate of payment at the beginning of an attorney's employment that may later be changed."). The Seventh Circuit could not have reached this conclusion if it had endorsed the Equity Committee's reading of Section 328(a). As noted above, Section 328(a) states that "reasonable terms and conditions of employment ... includ[e]" retention "on a contingent fee basis." If the Equity Committee is correct that Section 328(a)'s statement that "reasonable terms and conditions ... includ[e]" retention "on an hourly basis" means that an application seeking hourly compensation must be approved without alteration, it must also be the case that an application to employ a professional on a contingent fee basis must be approved without modifying the percentage the professional may take from the committee's recovery if successful. However, the Seventh Circuit took the view that a Bankruptcy Court is not automatically required to approve the contingent fee percentage sought in an employment application simply because that application seeks retention on a contingent fee basis. Rather, the Court acknowledged the Bankruptcy Court's power to fix a contingent fee schedule of its own design.
 
 
 31
 Our reading also draws support from several Bankruptcy Courts' interpretations of Section 328(a). These courts reviewed the reasonableness of terms and conditions of retention sought in employment applications despite the fact that those applications requested employment on a retainer, on an hourly basis, or on a contingent fee basis. See In re Dividend Dev. Corp., 145 B.R. 651, 654-55 (Bankr. C.D.Cal.1992) (holding that "§ 328(a) specifically mandates that the bankruptcy judge review the reasonableness of any fee arrangement" and applying this principle to an application to employ a professional on a retainer, despite Section 328(a)'s statement that "reasonable terms and conditions of employment" include compensation "on a retainer"); In re NBI, Inc., 129 B.R. 212, 222 (Bankr.D.Colo. 1991) (holding that "[i]nclusion of the term `retainer' in Section 328(a) of the Bankruptcy Code does not by definition qualify all retainer arrangements as reasonable" for the purposes of the "reasonable terms and conditions" inquiry); In re Mortgage & Realty Trust, 123 B.R. 626, 631 (Bankr. C.D.Cal.1991) (refusing to permit financial advisors to receive indemnification from the estate for liability arising out of the reorganization at issue, despite the advisors' retention on an hourly basis); C & P Auto Transp., 94 B.R. at 686 (noting that Section 328(a) permits Bankruptcy Courts to "requir[e] that [a] retainer fund be maintained in trust with no disbursements except upon court order," thus imposing additional terms and conditions on the retention of a professional sought to be employed on a retainer). Had these Bankruptcy Courts accepted the view that a court faced with an application to retain a professional on an hourly basis must also approve all of the other proposed terms and conditions of that professional's employment, including the professional's maximum monthly fee, they would not have evaluated the reasonableness of the terms and conditions sought.
 
 
 32
 By contrast, the authority cited by the Equity Committee concerning Section 328(a) provides no support for its position. The two Fifth Circuit decisions cited by the Equity Committee held that Bankruptcy Courts that have granted employment applications pursuant to Section 328(a) may not alter the terms and conditions they previously approved in the absence of changed circumstances incapable of being anticipated at the time of the applications. In neither of these cases did the court consider the circumstances under which a Bankruptcy Court must approve proposed terms and conditions under Section 328(a). The latter question is at issue here, as the Equity Committee argues that the maximum monthly fee sought in an application to employ a professional must be approved where the application seeks to compensate the professional on an hourly basis. See In re Barron, 225 F.3d 583, 586 (5th Cir. 2000) (holding that, before modifying terms and conditions of employment that it had initially approved, a Bankruptcy Court must find that changed conditions since the application were not capable of being foreseen at the time of the application); In re Texas Sec., Inc., 218 F.3d 443, 446 (5th Cir.2000) (holding that, barring changed conditions, a Bankruptcy Court may not compute a professional's compensation using a lodestar formula where the court has already approved a hybrid contingent fee/hourly rate formula pursuant to Section 328(a)); see also Broyles v. Tudor, Bailey & Co., 2000 WL 1206610, (N.D.Tex. Aug. 24, 2000) 2000 U.S. Dist. LEXIS 12260, at *6-9 (holding that a Bankruptcy Court could not rescind its approval of a contingent fee arrangement in the absence of changed conditions after granting an application to employ a professional using such a fee structure). In re Thermadyne Holdings Corp., 283 B.R. 749 (8th Cir. BAP2002), is also inapposite, because it concerned the reasonableness under Section 328(a) of an estate's indemnification of a professional for liability arising out of a reorganization proceeding — not the question whether the employment of a professional on an hourly basis requires the approval of all other proposed terms and conditions of that professional's employment.[8]
 
 
 33
 In sum, while Section 328(a)'s statement that "reasonable terms and conditions of employment" include retention "on an hourly basis" may mean that the concept of a professional's retention on an hourly basis is a reasonable term or condition, the mere fact that a committee seeks to employ a professional on an hourly basis does not preclude a Bankruptcy Court from evaluating the reasonableness of other terms and conditions. Accordingly, we hold that 11 U.S.C. § 328(a) authorizes the imposition of caps on the fees that a professional may charge, even if the committee that submitted the application at issue did not propose that limitation.
 
 III.
 
 34
 The Equity Committee next contends that, even if the Bankruptcy Court was permitted to impose a fee cap, the Court erred in imposing a cap in this case because the Court incorrectly relied on the Equity Committee's ability to avail itself of financial data compiled by the financial advisors retained by the Debtors, who supposedly have "a conflicting interest." Appellant's Br. at 27. In making this argument, the Equity Committee relies on 11 U.S.C. § 1103(b) and several Bankruptcy Court cases decided under that statute. Section 1103(b) reads as follows:
 
 
 35
 An attorney or accountant employed to represent a committee appointed under section 1102 of this title may not, while employed by such committee, represent any other entity having an adverse interest in connection with the case. Representation of one or more creditors of the same class as represented by the committee shall not per se constitute the representation of an adverse interest.
 
 
 36
 11 U.S.C. § 1103(b). The Equity Committee argues that D & T is an "accountant employed to represent" the Equity Committee, that the Equity Committee is a "committee appointed under section 1102," and that, if D & T received financial information from the Debtors' financial professionals, D & T would be "representing" the Debtors, who have an "adverse interest in connection with the case."[9] Hence, the Equity Committee maintains, D & T's receipt of financial information from the Debtors' professionals is barred by Section 1103(b).
 
 
 37
 We begin our analysis with Section 1103(b)'s plain language. See In re Hechinger Inv. Co., 335 F.3d 243, (3d Cir. Jul. 18, 2003) 2003 U.S.App. LEXIS 14449, at *21; Health Maint. Org. v. Whitman, 72 F.3d 1123, 1128 (3d Cir.1995); In re Segal, 57 F.3d 342, 345 (3d Cir.1995). Our examination of Section 1103(b)'s text leads us to disagree with the premise that, if it received financial data from the Debtors' professionals, D & T would be "representing" the Debtors. In ordinary language, "representing" a person entails — at the very least — acting pursuant to that person's direction. See Black's Law Dictionary 1301 (6th ed. 1990) ("To represent a person is to stand in his place; to speak or act with authority on behalf of such person; to supply his place; to act as his substitute or agent."); Webster's Ninth New Collegiate Dictionary 1000 (1986) (defining "represent," in pertinent part, as "to take the place of in some respect," or "to act in the place of or for[, usually] by legal right"). One could argue, as the Appellees do, that the Debtors have an interest in ensuring that the Equity Committee receives value from the Debtors' reorganization, that D & T might increase the value the Equity Committee can receive by using the Debtors' financial information to advise the Committee, and hence that D & T's acquisition of information from the Debtors would confer a benefit upon the Debtors. However, even if we assume that D & T's acquisition of information from the Debtors would incidentally benefit the Debtors, it is clear that D & T would not be acting pursuant to the Debtors' orders in obtaining information from them. Rather, D & T would be acting pursuant to the direction of its employer, the Equity Committee, in garnering that information. Accordingly, it cannot be plausibly asserted that D & T would "represent" the Debtors by acquiring financial data from the Debtors' financial professionals.[10] Consequently, the Bankruptcy Court did not violate Section 1103(b) by considering the availability of financial information from the Debtors in determining the amount at which to set the fee cap.
 
 IV.
 
 38
 Having discussed the Equity Committee's allegations of legal error, we next address the Equity Committee's contention that the Bankruptcy Court's decision to cap D & T's fees at $30,000 per month was unsupported by the record. As noted above, the Bankruptcy Court based its decision to cap D & T's fees on two factors. First, the court opined that since the Debtors are likely insolvent, the Equity Committee probably stood to receive no value from the Debtors' reorganization. Second, the court observed that the Debtors' financial advisors had already compiled a significant amount of financial data that D & T could use in assisting the Equity Committee. Since D & T needed only to analyze the information compiled by the Debtors in advising the Equity Committee, D & T did not need to perform an amount of work warranting the fees that the Committee sought in its application. The Equity Committee challenges both such findings. As noted above, we review the Bankruptcy Court's findings of fact for clear error.
 
 A.
 
 39
 The Bankruptcy Court provided the following explanation of its view that the Debtors were likely insolvent and that the Equity Committee was thus not entitled to receive value from the Debtors' reorganization:
 
 
 40
 I'm not suggesting that I am pronounced [sic] that the debtor has no equity. Based upon the numbers that have been presented, the rough numbers, 5.7 billion in claims plus at least 1.8 billion in asbestos liabilities and as I recall aren't there 265,000 or something like that personal injury claims pending against the debtor at this point — 375,000. I don't even know how 1.8 billion can cover it.
 
 
 41
 App. II at 169. The Bankruptcy Court's estimates of the Debtors' commercial debt and asbestos liability were identical to the figures presented in the Creditors Committee's objection to the application to retain D & T. See id. at 134-35. It hence appears that the Bankruptcy Court relied entirely on the Creditors Committee's calculations in reaching its conclusion regarding the Debtors' solvency. The Equity Committee objects to this finding on the ground that the Bankruptcy Court was not authorized to rely solely on the Creditors Committee's arguments in evaluating the Debtors' financial condition. Instead, the Equity Committee maintains, the Bankruptcy Court was required to take evidence on the question whether the Debtors were solvent. As we detail below, we find that the Bankruptcy Court's statements at the hearing provide an inadequate basis for effective appellate review.
 
 
 42
 We emphasized the need for Bankruptcy Courts to articulate their reasons for rejecting professionals' proposed fee structures in In re Busy Beaver Bldg. Ctrs., 19 F.3d 833 (3d Cir.1994) ("Busy Beaver"). In Busy Beaver, a law firm sought compensation for services it rendered to a debtor pursuant to 11 U.S.C. § 330(a)(1). The Bankruptcy Court denied the firm certain portions of the compensation it sought without affording the firm a hearing at which to justify those items. We vacated the Bankruptcy Court's order, instructing the court to hold a hearing concerning the reasonableness of the items of compensation at issue. Importantly, we added that "if after the hearing the court adheres to its views and disallows some of the requested compensation, it should enter sufficient findings of fact and conclusions of law in the record to facilitate appellate review." Busy Beaver, 19 F.3d at 847-48; see also In re Kula, 213 B.R. 729, 743 (8th Cir. BAP 1997) (adopting the requirement set forth in Busy Beaver). Although the Bankruptcy Court proceeding in the present case concerned the Equity Committee's attempt to obtain approval of D & T's proposed fee structure pursuant to Section 328(a), rather than under 11 U.S.C. § 330(a)(1), we think that the need for a Bankruptcy Court to articulate reasons for rejecting proposed terms and conditions of a professional's employment in order to facilitate appellate review is equally acute in the context of Section 328(a) proceedings. The Bankruptcy Court was thus required to articulate the reasons for its decision to impose a fee cap on the record.
 
 
 43
 In the present case, as noted above, the Bankruptcy Court's only explanation for its finding that the Debtors were probably insolvent relied on the figures provided in the Creditors Committee's objections to the Equity Committee's application to retain D & T. The Creditors Committee's objections do not indicate the basis of the Committee's calculations regarding the extent of the commercial debt of, and the asbestos-related claims against, the Debtors. As a result, the present record does not permit us to determine whether the Creditors Committee's calculations are based on reliable data or on mere speculation by the Committee's counsel. If the Committee's figures are only the latter, they do not supply a sufficient basis for the imposition of the fee cap, as it is well settled that arguments by counsel cannot provide factual support for a trial court's findings. See United States v. Rose, 104 F.3d 1408, 1416 (1st Cir.1997) ("[A]rgument by counsel is not evidence."); United States v. Jewel, 947 F.2d 224, 230 (7th Cir.1991); Morrissey v. William Morrow & Co., 739 F.2d 962, 967 (4th Cir.1984); GTE Prods. Corp. v. Kennametal, Inc., 772 F.Supp. 907, 917 (W.D.Va.1991). Accordingly, we find it necessary to vacate the Bankruptcy Court's order and remand so that the court can explain the basis for its determination that the Equity Committee likely stands to receive no value from the Debtors' reorganization.
 
 B.
 
 44
 Second, the Equity Committee objects to the Bankruptcy Court's finding that the Debtors' financial advisors had collected data that could be helpful to the Equity Committee. The Committee argues that "no facts were in the record to show the existence or availability of such information, let alone its utility." Appellant's Opening Brief at 28. The Bankruptcy Court, as noted above, stated at the hearing that it believed that the Debtors' financial advisors had compiled a large amount of financial information, and opined that the Debtors had the incentive to supply the Equity Committee with that information, as the Committee's interests "in many respects are aligned with the debtors because it's to the debtors [sic] advantage to try to maximize the amount of equity if there is any that might be available here." App. II at 166.
 
 
 45
 Our review of the record does not reveal the sources on which the Bankruptcy Court relied in determining that the Debtors had amassed financial information that D & T could use to assist the Equity Committee. Again, we can only determine the correctness of the Bankruptcy Court's factual findings if we understand the grounds for those findings. If the court relied on its own speculation or arguments by counsel in assessing the extent of the information that the Debtors could make available to the Equity Committee, we cannot affirm its decision. If, on the other hand, the court drew sound conclusions based on evidence in the record, we may do so. In view of this uncertainty, we are constrained to remand with instructions to explain the basis for the Bankruptcy Court's determination that the Debtors' professionals are capable of supplying the Equity Committee with financial data that will be useful to the Committee in representing the interests of its constituents.[11]
 
 C.
 
 46
 Finally, we make one additional point to guide the Bankruptcy Court's deliberations on remand. We note our disagreement with the Equity Committee's contention that, since Section 330(a)(1) by its terms addresses only awards of compensation for services previously rendered, the criteria it sets forth cannot be employed in determining whether the proposed terms and conditions of a professional's retention are "reasonable" under Section 328(a). We find the use of the word "reasonable" in both Section 328(a) and Section 330(a)(1) instructive on this issue. Section 328(a), as noted above, authorizes the retention of a professional "on any reasonable terms and conditions of employment." 11 U.S.C. § 328(a) (emphasis added). Section 330(a)(1) authorizes a Bankruptcy Court to award a professional "reasonable compensation for actual, necessary services rendered," and then lists several criteria to be used in determining the reasonableness of the fees sought. 11 U.S.C. § 330(a)(1). It is well established that "[i]dentical words used in different parts of the same act are intended to have the same meaning." Barnhart v. Walton, 535 U.S. 212, 221, 122 S.Ct. 1265, 152 L.Ed.2d 330 (2002) (quoting Dept. of Revenue of Ore. v. ACF Indus., Inc., 510 U.S. 332, 342, 114 S.Ct. 843, 127 L.Ed.2d 165 (1994)). Though we need not decide whether Congress intended to limit Bankruptcy Courts to considering only the Section 330(a)(1) factors when determining the reasonableness of a requested fee structure under Section 328(a), we believe that the Section 330(a)(1) factors may be taken into account in asking whether a fee request is reasonable. The District Court therefore did not err in considering the Section 330(a)(1) factors when evaluating the reasonableness of the fee cap imposed by the Bankruptcy Court, and the Bankruptcy Court on remand may consider those factors in determining the reasonableness of the terms and conditions of employment proposed by the Equity Committee.
 
 V.
 
 47
 For the foregoing reasons, we hold that the Bankruptcy Court was authorized to impose a cap on D & T's fees under Section 328(a), and that the Bankruptcy Court was not precluded from computing the amount of the cap based on the Equity Committee's ability to rely on data supplied by the Debtors' financial professionals. However, we vacate the Bankruptcy Court's order and remand for further proceedings so that the Bankruptcy Court can explain the factual basis for its decision to impose the cap.
 
 
 
 Notes:
 
 
 [1]
 We say that the Bankruptcy Court concluded that the Debtors were "probably insolvent" because the court did not unqualifiedly endorse the proposition that the Debtors were insolventSee App. II at 169 ("I'm not suggesting that I am pronounced [sic] that the debtor has no equity.").
 
 
 [2]
 The Equity Committee also contends that the District Court erred by analyzing the fee cap under the wrong section of the Bankruptcy Code and agreeing with the Bankruptcy Court's factual findingsSee Appellant's Opening Brief at 18-21, 25, 29. We cannot, however, grant the Equity Committee relief based on the District Court's alleged errors. Rather, our review is limited to the Bankruptcy Court's decision. As the Sixth Circuit aptly observed in In re Trident Assoc., Ltd., Pshp., 52 F.3d 127, 130 (6th Cir.1995), "[t]his court directly reviews the bankruptcy court's decision, not the district court's review of the bankruptcy court's decision." See also In re Pizza of Hawaii, Inc., 761 F.2d 1374, 1377 (9th Cir.1985) ("Because we are in as good a position as the district court to review the findings of the bankruptcy court, we independently review the bankruptcy court's decision.").
 
 
 [3]
 These factors include "the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title." 11 U.S.C. § 330(a)(1)
 
 
 [4]
 See Appellant's Br. at 13 (relevant Bankruptcy Code provisions "only permit approval (or denial) of retention on `reasonable' terms, not unilateral alterations....")
 
 
 [5]
 The second sentence of 11 U.S.C. § 328(a) is entirely consistent with, and indeed supports, this interpretation. The second sentence states that a professional must be paid in accordance with any terms and conditions of employment that are fixed when the employment is approved unless "such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions." The second sentence of 11 U.S.C. § 328(a) thus forecloses the argument that a Bankruptcy Court, if presented with an application containing an unreasonable term or condition, may approve the application but correct the unreasonable term when compensation is later sought
 
 
 [6]
 Moreover, the Bankruptcy Court may reserve judgment regarding the reasonableness of certain proposed terms and conditions until later in the proceedingSee In re Circle K Corp., 279 F.3d 669, 671 (9th Cir.2001) ("[A] bankruptcy court is not compelled to accept a professional's employment under § 328 merely because the application cites that statutory provision. The bankruptcy court is free to make clear that it is only conditionally approving the professional's retention.").
 
 
 [7]
 It is unclear whether the language in question must be read as going even this far. It is arguable that it means only that the concept of employment on an hourly basis may be reasonable under appropriate circumstances. In other words, there may be circumstances in which it is customary to employ a professional on a different basis that is more favorable to the employer, and under those circumstances, employment on an hourly basis might not be reasonable. But we need not and do not decide that issue here. For the sake of argument, we assume that the concept of employment on an hourly basis is reasonable
 
 
 [8]
 Several precedents cited by the Equity Committee do not even concern Section 328(a), and are thus unhelpfulIn re Standard Steel Sections, Inc., 200 B.R. 511 (S.D.N.Y.1996), addressed the question whether a creditors' committee had shown that the appointment of counsel to represent it was "necessary" under Fed. R. Bankr.P.2014(a), and accordingly does not further the Equity Committee's position. In re Lion Capital Group, 44 B.R. 684 (Bankr.S.D.N.Y.1984), is of no help to the Equity Committee, because it addressed the unrelated question whether a law firm was barred from representing a creditors' committee by the conflict-of-interest prohibition contained in 11 U. S. C. § 1103(b).
 Finally, the cases cited by the Equity Committee in favor of the proposition that "bankruptcy courts should defer to a committee's choice of professionals," see Panduit Corp. v. All States Plastic Manuf. Corp., 744 F.2d 1564 (Fed.Cir.1984), In re Caldor, Inc., 193 B.R. 165 (Bankr.S.D.N.Y.1996), In re Brennan, 187 B.R. 135 (Bankr.D.N.J.1995), In re Walnut Equip. Leasing Corp., 213 B.R. 285 (Bankr. E.D.Pa.1997), do not bear on this case. Even if we assume that Bankruptcy Courts should defer to a committee's choice of professionals, it does not follow that they must defer to a professional's choice of fee arrangements.
 
 
 [9]
 The Equity Committee's discussion on this point is not wholly clear, but we believe it is most plausibly read to make the claim that D & T would be "representing" the Debtors under Section 1103(b) if it acquired financial information from them. If the Equity Committee is instead arguing that compelling the Debtors' financial advisors to furnish D & T with data would amount to forcing the Debtors' professionals to "represent" the Equity Committee, we are still unpersuaded. The defect in this argument is that the Debtors are not a "committee appointed under section 1102" of the Bankruptcy Code. Section 1102 permits the United States Trustee to appoint creditors' and equity security holders' committees, not debtorsSee 11 U.S.C. § 1102; see also 7 Collier on Bankruptcy § 1103.04[1] (15th ed. rev.2002) (contrasting the limitations on dual representation by professionals retained by a committee under Section 1103(b) with the limitations placed on professionals retained by debtors in possession under 11 U.S.C. § 327(a)).
 
 
 [10]
 We find the authorities cited by the Equity Committee concerning Section 1103(b) inapposite. InIn re Saxon Indus., 29 B.R. 320 (Bankr.S.D.N.Y.1983), a Bankruptcy Court rejected an equity committee's proposal to use "all reports and information generated by" accountants employed by a creditors' committee in lieu of retaining its own financial professionals. Saxon Indus., 29 B.R. at 321. Such an arrangement would violate Section 1103(b), the Bankruptcy Court held, because "an accountant retained by the Creditors' Committee cannot also represent the interests of the Equity Committee." Id. Saxon Industries thus held that a creditors' committee's provision of financial information to an equity security holders' committee amounts to representation of the latter, not that an equity committee's mere receipt of such information constitutes "representation" of the creditors' committee. As such, Saxon Industries is not on point. See also In re Evans Products Co., 58 B.R. 572, 575 (S.D.Fla.1985) (treating a substantially similar situation).
 In In re Grant Broad. of Phila., Inc., 71 B.R. 655 (Bankr.E.D.Pa.1987), a Bankruptcy Court rejected a law firm's attempt to represent a creditors' committee when it already represented another group of creditors in the bankruptcy proceeding at issue. Since there was no question in Grant Broadcasting that the firm sought to "represent" both committees within the meaning of Section 1103(b), that case does not further the Equity Committee's position.
 
 
 [11]
 We note that, in explaining its decision to impose the fee cap, the Bankruptcy Court may take judicial notice of facts that are not subject to reasonable disputeSee In re Indian Palms Assocs., 61 F.3d 197, 205 (3d Cir. 1995) (stating that a Bankruptcy Court is "authorize[d]... to take judicial notice of an adjudicative fact if that fact is `not subject to reasonable dispute'") (quoting Fed.R.Evid. 201(b)); In re Bozzelli, 227 B.R. 770, 771 (Bankr.E.D.Pa.1998) (stating that a Bankruptcy Court may "take judicial notice of adjudicative facts not subject to reasonable dispute... so long as it is not unfair to a party to do so and does not undermine the trial court's fact finding authority'") (quoting Indian Palms Assocs., 61 F.3d at 205). See also Fed.R.Evid. 201(f) (judicial notice may be taken at any time).